## KINCAID v. UNITED STATES.

### No. 45700.

United States Court of Claims.

Decided April 3, 1951.

Geo. E. H. Goodner, Washington, D. C., Scott P. Crampton, Washington, D. C., on the brief, for plaintiff.

Benton C. Tolley, Jr., Washington, D. C., Newell A. Clapp, Acting Asst. Atty. Gen. for defendant.

JONES, Chief Judge.

This is a suit by plaintiff for payments alleged to be due for the year 1939 under the Soil Conservation and Price Adjustment Programs.

The defendant denies liability and in a counterclaim asks for a judgment against plaintiff for penalties for alleged marketing of cotton in the years 1941–1943 in excess

of the marketing quotas allotted to him for those years.

Before JONES, Chief Judge, and LITTLETON, WHITAKER, MADDEN and HOWELL, Judges.

The law provided a double-barrelled program. It was built around soil conservation under the AAA, Act of 1938, 7 U.S.C.A. § 1281 et seq.[1] Its declaration of purpose stated that it was enacted "for the purpose of conserving national resources, preventing the wasteful use of soil fertility, and of preserving, maintaining, and rebuilding the farm and ranch land resources in the national public interest; to accomplish these purposes through the encouragement of soil-building and soil-conserving crops and practices; to assist in the marketing of agricultural commodities for domestic consumption and for export; * * * assisting farmers to obtain * * * parity prices * * * assisting consumers to obtain an adequate and steady supply of such commodities at fair prices."

Farmers who complied with the program were entitled to two kinds of payments. One was for holding soil-depleting crops to an amount not in excess of their allotted acreages, and for preserving and rebuilding the soil on the excess acres through soil-conserving and soil-building crops and practices. The other type was that of parity payments, which, when funds were available, were made to those farmers who were in compliance.

The programs were handled by and through national and regional officers and state, county, and community committees.

Plaintiff leased approximately 1,450 acres of land in Missouri at a cash rental price of $10 per acre from Lee Wilson and Company. He then proceeded to operate this leased acreage through tenants and share croppers. The usual distinction between a tenant and a share cropper is that ordinarily a tenant furnishes his own equipment and essential livestock, and usually pays the landlord one-fourth of the production and keeps three-fourths. The term of share cropper usually applies to the relationship when the landlord furnishes the tools, equipment, and essential livestock, and the production is divided half and half.

In the regular way plaintiff was notified that his allotment of cotton, which was a soil-depleting crop, would be 557 acres.

Through the county office plaintiff was furnished a worksheet by which he was advised that the parity payments to be made that year would be 1.6 cents per pound. The soil payments were to be two cents per pound. He was also told in writing to be certain to list every person growing cotton on his farm that year, whether renter, cropper, or "person working by the day for a certain acreage of cotton instead of for wages," and to furnish the approximate acreage of cotton and the share of each tenant; and that the tenant's signature should be furnished in connection with the worksheet. There were blanks at the bottom of the sheet for the names of the tenants and for their signatures. As completed and reported by the plaintiff, the worksheet named four share croppers who were to operate a total of 51 acres, and plaintiff named himself as the operator of 506 acres.

The two types of payments were to be divided between landlords, tenants and share croppers on the basis of their respective shares of the cotton produced.

Later the county committee ascertained that instead of having only four share croppers, the plaintiff was operating through 23 tenants and share croppers. He was required to secure their signatures and the addition of these 19 names materially reduced the amount of the payments to be made to the plaintiff.

After the signing of the application the county office computed the amount of the two types of payments under the Soil Conservation Program and the Price Adjustment Program as totaling $6,096.43.

The regulations governing the payments provided that all or any part of the payments might be withheld (1) if the land was overplanted in a soil-depleting

1. Agricultural Adjustment Act of 1938, approved February 16, 1938, 52 Stat. 31.

crop or (2) if the applicant adopted any practice which the Secretary determined would tend to defeat any of the provisions of the Price Adjustment Program.

Among the things that the Secretary determined would tend to defeat the program was any side oral or written agreement by which the landlord was to receive more than his share of the payment, or was to be paid directly or indirectly any portion of the payment which was made to the tenant or share cropper.

In the latter part of 1939 some question arose as to the conduct of Lee Wilson and Company, the owner of this and other farms, in connection with the programs of the previous years back to 1933; an investigation was made in reference thereto. In connection with that investigation it developed that Mr. Kincaid had stated that he bought the crops of 17 of his share croppers and that four of the share croppers remained on the farm and harvested their crops, but attention was called to a statement by some other witnesses which indicated that the 17 share croppers did not abandon their crops voluntarily; that the plaintiff forced these 17 share croppers to surrender and leave their crops or pay him an additional $5 per acre cash rent on the land they had planted to cotton, or agree to turn over their part of the Government payments to him.

On the basis of this information the Arkansas State Committee and the Mississippi County Committee determined that plaintiff had violated the provisions of the regulations and recommended that he be denied payment for the year 1939. However, it developed that the plaintiff was not present at the hearing, and the county committee asked that the case be reheard by the state committee. The request was granted and after the hearing J. B. Daniels, of the state committee, wrote plaintiff and also wrote I. W. Duggan, the Director of the Southern Division of the AAA, recommending that Mr. Kincaid, notwithstanding the violation of the regulations, be allowed to settle with his tenants and thus adjust his right to receive the two types of payments. In the course of the correspondence, on January 29, 1941, R. F. Croom, who was in charge of the landlord-tenant relationship for the entire Southern Division, wrote to Mr. Daniels advising him that while it had been determined that Mr. Kincaid had adopted practices which tended to defeat the purposes of the program, nevertheless if the payments that had been exacted from the tenants were refunded, Mr. Kincaid would be allowed to retain his proper portion of the payments; but that if this could not be done, Mr. Kincaid should be asked to refund to the Government all the payments that had been received by him. Evidently Mr. Croom at the time of writing that letter was under the impression that Mr. Kincaid had already been paid for compliance.

Apparently this method of settlement was agreeable to the state committee and in pursuance of the settlement the plaintiff refunded $5 per acre to the four tenants from whom he had exacted such additional rental payments. These refund checks were issued March 1, and paid March 3, 1941.

On March 10, 1941, R. F. Croom wrote a letter saying that because of certain other developments in connection with the Lee Wilson and Company case his previous letter should be disregarded and plaintiff's action should be held as tending to defeat the program, and that the payments should be withheld from plaintiff. On March 17, 1941, the Acting Director of the Southern Division submitted a memorandum to the Secretary of Agriculture which in effect advised against making the payments. On April 2, 1941, Duggan replied to an inquiry by Daniels, in which Mr. Duggan, as Director of the Southern Division, indicated that Mr. Kincaid had plainly violated the regulations and that he should not be paid the amounts that would otherwise be due him. He expressed regret at Mr. Croom's letter of January 29, 1941, but stated that the regulations were prescribed by the Secretary of Agriculture, and that neither he nor the other employees had any authority to vary from them.

The payments under the 1939 program have not been made to the plaintiff.

The plaintiff clearly and deliberately violated the regulations of the Secretary of Agriculture, and therefore in line with their clear and specific terms he is not entitled to payments unless the agreed settlement by the terms of which he refunded to the four tenants from whom he had exacted payments constituted a new contract which cleared him of what would otherwise amount to the grounds for forfeiture of payment. He earnestly insists that this agreement, signed by officials of the Southern Region and the state committee, followed by a refund of the payments of $5 per acre to the four tenants, constituted a clearance of any default in the original obligation and therefore plaintiff should be paid.

We have serious doubts as to whether there was any consideration for any new contract which is claimed by the plaintiff. True, the plaintiff did return the $5 per acre to the share croppers, but he was clearly obligated to do this under the terms of the regulations and it is difficult to hold that the payment of a just debt constitutes consideration for the binding effect of a new contract. But the more serious question involved in this case is the question of the authority of anyone other than the Secretary to waive the violation. Section 16 of the regulations authorizes the withholding of the payments if the applicant adopts any practice which the Secretary determined tended to defeat any of the provisions of the 1939 or previous agricultural programs. The committee found that this was done. In fact, it was in effect admitted by the plaintiff.

The question of authority of any person to bind the Government is discussed in the case of Federal Crop Insurance Corp. v. Merrill, 332 U.S. 380, 68 S.Ct. 1, 92 L.Ed. 10. In that case the farmer who was the insured had been told by the county agricultural conservation committee, local agent for the Government in wheat insurance program, that his entire crop could be insured, and the insurance was taken and paid for on that basis. It developed that the major portion of the wheat thus insured was on reseeded winter wheat acreage; that is, it was first planted in winter wheat and evidently because of crop failure had been reseeded in spring wheat.

The applicable regulation precluded insurance for reseeded wheat acreage. The farmer had no knowledge of this when he filed his application, and was misled to a contrary belief by the county committee. The Supreme Court denied recovery of the insurance policy because of the fact that the provisions of the regulations were held to be controlling, and this was held to be true even though the farmer could have recovered had it been a private insurance company. We quote from page 384 of 332 U.S., page 3 of 68 S.Ct., the following language: "Whatever the form in which the Government functions, anyone entering into an arrangement with the Government takes the risk of having accurately ascertained that he who purports to act for the Government stays within the bounds of his authority. The scope of this authority may be explicitly defined by Congress or be limited by delegated legislation, properly exercised through the rule-making power. And this is so even though, as here, the agent himself may have been unaware of the limitations upon his authority."

This seems to be a rather harsh rule, but the Supreme Court is the final authority in matters of this kind. At any rate, we have no hesitancy in giving it full application and effect in this particular instance. The plaintiff showed no disposition in connection with the marketing of the year 1939 or the conduct of the program for that year, nor in later years, to go along in good faith with the program as defined in the act and regulations issued pursuant thereto. He failed to list his tenants. He undertook to wring from them a greater share of the payments than the law provided. He induced some of them to pay him an extra amount as a condition to their remaining on the land.

To get a full realization of what the program meant, one must go back to the conditions that prevailed in the early thirties to ascertain the reason and philosophy behind the farm program as it was then established and as it was later worked out and perfected.

In 1932 agriculture was prostrate. Farmers were losing their homes all over the country by foreclosure. Farm prices were below the cost of production and the purchasing power of the rural areas of America had been practically destroyed. This destruction of purchasing power and declining prices had finally affected the industrial areas, so reducing the marketing outlets for the products of industry that losses were being sustained. Thus the entire economy was locked and sinking.

One of the major steps in restoring the country was a program for agriculture which was to lead in the march back to equality for the citizens of this country and to a solid basis of national prosperity. While the original act was held invalid by the Supreme Court, the new act was based on the experience and knowledge gained from the operations under the first act and carried forward its philosophy and purposes. Both acts recognized the basic nature of the products of the land. The later act, however, placed greater emphasis on the problems incident to the proper use of soil and water. Conservation was and is at all times so fundamental that its necessity has been recognized by practically all thinking people who are familiar with the subject.

Our national life was vitally affected by the program that was thus put into operation. Certainly anyone who tilled the soil and who knew anything at all about the troubles, the difficulties, the hardships involved in the production and marketing of the crops of individual farmers, must have realized that some program was necessary if the farm life conditions were to remain even reasonably tolerable. Anyone who lifted up his eyes and looked across this country could certainly easily know these facts.

One can have little patience in these circumstances with anyone who tried to take an unfair advantage of his neighbor in transactions of this kind, and who indulged in practices the necessary tendency of which was to undermine the entire program. He cannot complain if he suffers the consequences of his own deliberate act. One could respect the attitude of those who refused to have anything to do with the program. Though they perhaps lacked understanding of its over-all purpose, they were nevertheless men of conviction. But for the man who accepted the program and assumed to go along, and yet who sought unfair advantage of his neighbors and fellow farmers, there cannot be much claim for generous action. He is entitled to just what the law gives him; only that and nothing more.

In these circumstances we do not hesitate to apply the principles laid down in the Federal Crop Insurance Corp. case, supra.

There remains the question of defendant's counterclaim. As a further aid in securing compliance with limitations of production of soil-depleting crops, the act had provided a penalty of three cents per pound on cotton marketed from acreage planted in excess of the allotment by the AAA. In February 1941 this penalty was increased from three to seven cents per pound. If any farmer planted in excess of the acreage allotted to him, this penalty was to be exacted on any marketings during that year on any cotton produced on the excess acreage. If a farmer planted within his allotted acreage he was given a white card which entitled him to market all cotton produced by him free of any penalty. If he planted in excess of his allotment he was given a red card. This red card entitled him to sell his allotted production without penalty, but on any excess sales he was required to pay the penalty of seven cents per pound. The ginner was required to record the ginnings and if the red card showed that the allotment had already been ginned, the ginner was required to

collect seven cents per pound on any excess at the time of the ginning.

There was considerable evidence in this case that plaintiff undertook in other counties and even in another State, to sell his excess cotton without penalty through friends and relatives who had white cards and were entitled to sell their cotton without penalty. There are a good many circumstances to indicate several different violations. However, in some of these instances the evidence is not quite sufficient and not entirely satisfactory. In one or two instances it does not even rise to the dignity of a charge, but sinks to the level of suspicion. In view of the disposition of the main part of the case we are not inclined to hold the evidence sufficient to make a definite finding except in one instance.

In this particular instance an employee of plaintiff, at the plaintiff's direction, hauled cotton from plaintiff's farm in Missouri to Lunsford, Arkansas, using the plaintiff's International truck. The plaintiff instructed the driver to inform the ginner that the cotton belonged to J. N. Ridge. The driver did as directed and the cotton was ginned and marketed in the name of J. N. Ridge. Ridge was the brother-in-law of the plaintiff. The checks for the sale of the cotton were issued to J. N. Ridge, were endorsed by him, and three of them were also endorsed by Mrs. G. S. Kincaid. The cotton covered by these deliveries totalled 6,520 pounds. This cotton was produced by the plaintiff and marketed by him in the name of J. N. Ridge. We see no escape from allowing the Government to recover on this phase of the cross action.

Plaintiff's petition is dismissed and defendant is given judgment against the plaintiff for seven cents per pound on the marketing of 6,520 pounds of cotton in violation of the law and regulations and subject to the penalty indicated, in the total amount of $456.40.

HOWELL, MADDEN, WHITAKER, and LITTLETON, Judges, concur.