Dennis MART, Thomas G. Mart, and
Cheryl Mart, Plaintiffs–
Appellants,

v.

Mike MART, Defendant–Appellee.

No. 11–0658.

Court of Appeals of Iowa.

Oct. 17, 2012.

Michael R. Bovee of Montgomery, Barry, Bovee & Barry, Spencer, for appellants.

Dan Connell of Dan Connell P.C., Storm Lake, for appellee.

Heard by DOYLE, P.J., and DANILSON and MULLINS, JJ.

**DANILSON, J.**

Farmland landlords appeal from the denial of this forcible entry and detainer action. Where the farm tenant cured his material breach by restoration of wetlands and the landlords[1] incurred no damages, the landlords are not entitled to forcible entry and detainer.

## I. Background Facts and Proceedings.

George Mart previously owned the leased property at issue here–240 acres of farmland in Dickinson County. Dennis Mart, Thomas Mart, Cheryl Mart, and Mike Mart are the children of George.

■ On March 30, 1987, 8.7 acres (sitting in two different spots) of the farmland were determined to be "converted wetland" by the USDA.[2] On March 14, 1988, George received the "Highly Erodible Land and Wetland Conservation Determi-

---

1. Our use of the term "landlords" refers only to Dennis, Thomas, and Cheryl Mart, although we acknowledge that Mike Mart is a co-owner and landlord with his siblings, as well as the farm tenant.

2. 16 U.S.C. § 1308 provides, in part:

 (7)(A) The term "converted wetland" means wetland that has been drained, dredged, filled, leveled, or otherwise manipulated (including any activity that results in impairing or reducing the flow, circulation, or reach of water) for the purpose or to have the effect of making the production of an agricultural commodity possible if—
 (i) such production would not have been possible but for such action; and
 (ii) before such action—
 (I) such land was wetland; and
 (II) such land was neither highly erodible land nor highly erodible cropland.
 . . . .
 (27) The term "wetland," except when such term is part of the term "converted wetland," means land that—
 (A) has a predominance of hydric soils;
 (B) is inundated or saturated by surface or groundwater at a frequency and duration sufficient to support a prevalence of hydrophytic vegetation typically adapted for life in saturated soil conditions; and
 (C) under normal circumstances does support a prevalence of such vegetation.
 For purposes of this Act, and any other Act, this term shall not include lands in Alaska identified as having high potential for agricultural development which have a predominance of permafrost soils.

nation," which stated, "Drainage of Wetlands in Fields 2, 3 and planting to commodity crops would constitute a violation of Swampbuster."[3]

On November 30, 1998, George leased the farmland to Mike for "$85.00 per acre for tillable acres as determined by Government survey." The lease was to end on February 28, 2018. The lease also provided:

2. Rent....

... Participation of this farm in any offered program by the U.S. Department of Agriculture or any state or crop production control or soil conservation, the observance of the terms and conditions of this program, and the division of farm program payments requires Landlord's consent....

....

4. Input Costs and Expenses.... Tenant shall only be entitled to pasture or till those portions of the Real Estate designated by landlord....

5. Proper Husbandry; Harvesting of Crops; Care of Soil, Trees, Shrubs and Grass. Tenant shall farm the Real Estate in a manner consistent with good husbandry, seek to obtain the best crop production that the soil and crop season will permit, properly care for all growing crops in a manner consistent with good husbandry, and harvest all crops on a timely basis.... Tenant shall comply with all terms of the conservation plan and any other required environmental plans for the leased premises. Tenant shall do what is reasonably necessary to control soil erosion including, but not limited to the maintenance of existing watercourses, waterways, ditches, drainage areas, terraces and tile drains, and abstain from any practice which will cause damage to the Real Estate.

Section twelve of the lease allowed either tenant or landlord to "pursue the legal and equitable remedies" if the other violated the terms of the lease.

George died in 1999, and the property at issue passed to his four children as joint tenants in common. Mike continued to farm the property. Mike was aware of the wetland designation since 1987 and the 8.7 acres of wetland were left in alfalfa and not farmed until the 2008 crop year when Mike tilled it and planted corn.

Mike informed the USDA office that he had planted corn on the wetland, and the Dickinson County Farm Service Agency (FSA) found Mike's actions violated the Swampbuster provisions of the Food Security Act of 1985 (16 U.S.C. §§ 3801, 3821–3824).

In a letter dated September 11, 2008, sent to Mike and the landlords, the USDA Natural Resources Conservation Service (NRCS) stated there had been a preliminary technical determination that "you have converted wetlands" and "[p]roduction of an agricultural commodity or further manipulation of Converted Wetlands (CW) can cause ineligibility for Farm Program benefits." A subsequent letter from the NRCS, dated October 22, 2008, informed the parties that a final technical determination had been reached concluding that the Swampbuster law had been violated by the conversion of the wetlands.

---

**3.** In order to combat the disappearance of wetlands through their conversion into crop lands, Congress passed a law known commonly as "Swampbuster." *Gunn v. USDA,* 118 F.3d 1233, 1235 (8th Cir.1997) (citing Food Security Act of 1985 §§ 1201, 1221–23, 16 U.S.C. §§ 3801, 3821–24). The law denies eligibility for several federal farm-assistance programs if wetlands are converted to agricultural use. *See Barthel v. U.S. Dep't of Agric.,* 181 F.3d 934, 936 (8th Cir.1999).

Mike appealed, and he and his siblings—as co-owners of the land Mike farmed—were notified the Dickinson County FSA Committee[4] would review the determination on February 9, 2009. Letters from the FSA dated February 17, 2009, were sent to each of the siblings informing them the wetlands determination was correct and informed them of appeal options.

Mike restored the wetlands for the 2009 crop year.

In April 2009, Dennis, Thomas, and Cheryl each received notice from the FSA that the violation of Swampbuster made them ineligible to receive USDA benefits. Thomas was directed to refund $152,093.38 in 2008 government farm payments and loans he had received. Dennis was directed to refund the 2008 CRP payment he had received in the amount of $385. Cheryl was advised she would be ineligible for USDA program benefits for all subsequent program years until the wetland was restored. Dennis, Thomas, and Cheryl all appealed the benefit ineligibility determination, contending they had no knowledge of and did not consent to the planting of the converted wetlands. Ultimately, on June 4, 2009, the FSA "determined Good Faith on your behalf and the Landlord Exemption" applied and the 2008 benefits were reinstated. However, "to avoid loss of benefits for future years, the Converted Wetlands must be established and maintained in a way that complies with wetlands standards and requirements for a converted wetland classification." Dennis, Thomas, and Cheryl were thus each required to ensure future compliance.

On August 31, 2009, Mike received a notice to quit and vacate the farmland on or before March 1, 2010,

> for reason that you breached the provisions of the Farm Lease dated November 30, 1998, ... by failing to comply with the terms of the conservation plan and other required environmental plans for the real estate; by failing to maintain waterways and drainage areas, and by failing to abstain from practices which damaged the real estate. See Final Technical Determination issued by the Natural Resources Conservation Service and NRCS Notice attached hereto and incorporated herein by this reference.

A notice of termination of farm tenancy was served on Mike.

On May 4, 2010, Dennis, Thomas, and Cheryl filed a petition for forcible entry and detainer (FED) against Mike.[5] Trial was held on January 11, 2011, following which the district court dismissed the petition for FED. The court rejected the contention of Dennis, Thomas, and Cheryl (landlords) that the undisputed Swampbuster violation also constituted a violation of the farm lease. The landlords appeal.

## II. Scope and Standard of Review.

█ A FED action is tried in equity and our review is therefore de novo. Iowa R.App. P. 6.907; *Petty v. Faith Bible Christian Outreach Ctr., Inc.*, 584 N.W.2d 303, 306 (Iowa 1998). We give weight to the trial court's findings, especially with regard to witness credibility, but we are

4. The federal regulations divide administrative responsibilities between three USDA agencies: the NRCS, the local FSA office, and the National Institute of Food and Agriculture. *See* 7 C.F.R. § 12.6(b), (c), (d). The FSA is primarily responsible for determining violations and benefit eligibility issues. *See* 7 C.F.R. § 12.6(b).

5. The parties entered into an agreement to allow Mike to farm the land pending the decision in the FED action, which was set for hearing on September 9, 2010, but subsequently rescheduled for January 11, 2011.

not bound by those findings. *Petty,* 584 N.W.2d at 306.

## III. Analysis.

■ Our discussion is guided by these general principles.

A lease is both a contract and a conveyance. Therefore, we look to ordinary contract principles when construing a lease.

We recognize "in the construction of written contracts, the cardinal principle is that the intent of the parties must control; and except in cases of ambiguity, this is determined by what the contract itself says." The intent of the parties may be determined from the terms of the lease, what is necessarily implied from the terms, and the circumstances surrounding the formation and execution of the lease.

*Dickson v. Hubbell Realty Co.,* 567 N.W.2d 427, 430 (Iowa 1997) (citations omitted).

■ The general rule is that "substantial compliance with the terms of a lease will avoid a forfeiture." *Beck v. Trovato,* 260 Iowa 693, 150 N.W.2d 657, 659 (1967); *see also Jack Moritz Co. Mgmt. v. Walker,* 429 N.W.2d 127, 130 (Iowa 1988) (noting that forfeitures are not favored in law or equity).

### A. Was section four of the lease violated?

The landlords contend Mike's actions in tilling and planting corn on the wetlands violated section four of the farm lease. The landlords point to the following language: "Tenant shall only be entitled to pasture or till those portions of the Real Estate designated by Landlord." The landlords argue that in as much as they have never designated the wetland for tilling, and in light of Mike's historical behavior in *not* planting the wetland from 1989 to 2008, it can be inferred that the wet-

lands were not to be tilled. Mike responds that the term "designated" used in the lease has an ordinary meaning of "stated." The district court ruled that there was "no evidence that any landlord actually designated land to be pastured or tilled."

There was evidence presented that 8.7 acres of the leased farmland had been designated wetlands by the USDA and had not been tilled since the designation in 1987. The landlords assert this extrinsic evidence shows George "designated" portions of the land for "pasture or tilling." We acknowledge that extrinsic evidence might assist us in interpreting the lease where there is an ambiguity. *See Dickson,* 567 N.W.2d at 430 ("Proof of the circumstances may make a meaning plain and clear when in absence of such proof some other meaning may also have seemed plain and clear." (internal citations omitted)). Here, Mike was well aware that the farming practice on this land was not to till the wetland parcels. He was fully aware that the wetlands had been certified by the USDA and a failure to comply with the Swampbuster law meant he was denied other governmental benefits provided by farm programs.

To "designate" is "to indicate or specify; point out." *American Heritage College Dictionary* 384 (4th ed. 2004). The lease identifies the farmland by legal description and states it "contain[s] 240 (total)(tillable) acres, more or less." We question whether a landlord must personally instruct a farm tenant what would seem obvious to even a novice farmer—which portions of the land had been tilled in the past and may be tilled in the future. Otherwise an unscrupulous tenant could immediately till up wetlands, pastures, or any other areas not previously tilled by the landlord unless the landlord pointed out the obvious. Thus, section four could be interpreted that any fields or parcels not previously

tilled may not be tilled unless designated or approved by the landlord.

■■■ However, that issue need not be resolved here because Mike was fully aware that the two small parcels were wetlands, that the wetlands had been formally certified and determined to be wetlands under the Swampbuster law in 1987, and could not be tilled and used to produce an agricultural commodity such as corn.[6] The evidence does not reflect whether Mike gained this knowledge from his father, who first served as his landlord, or by notice from the USDA, but we are satisfied that he gained the knowledge from one of those sources. There is also no evidence that the plaintiffs-landlords or George Mart ever gave Mike any directions that he could till the certified wetlands. We decline to interpret section four to require a landlord to personally inform, state, or further designate to his or her farm tenant what portions of the farm may be tilled when the farm tenant is already fully informed. Under these facts, we believe the requirement that the landlord designate which portions of the real estate may be tilled has been satisfied. Accordingly, Mike's act of tilling the wetlands constituted a breach of section four of the lease.

### B. Did Mike's tilling and planting the wetlands violate section five of the lease?

The landlords contend that Mike violated section five of the lease because he did not "comply with all terms of the conservation plan and any other environmental plans for the leased premises." They also argue that his actions were not in compli-

ance with the "good husbandry" standard of care imposed by that same section.

The district court was not convinced that the Swampbuster Act was a conservation plan or environmental plan for the leased premises. It also found that Mike's farming practices demonstrated "an above average standard that conforms to the principles of good husbandry." The landlords argue both findings were erroneous.

■■■ 1. "Conservation plan"? We have no real doubt that, generally speaking, the Swampbuster Act is a conservation measure. See Clark v. U.S. Dep't of Agric., 537 F.3d 934, 941 (8th Cir.2008) (noting the "general purpose of the statute" is an "effort to combat the disappearance of wetlands through their conversion into crop lands" (internal quotation and citation omitted)). As one court has summarized:

> [T]he purpose of the "Swampbuster" Act is to " 'combat the disappearance of wetlands through their conversion into crop lands.' " Thus, "the goal of the Swampbuster Act [w]as preservation of wetlands, and the 'stick' for enforcement of its provision [w]as loss of federal farm program benefits if wetlands are improperly converted."

B & D Land & Livestock Co. v. Veneman, 332 F.Supp.2d 1200, 1208 (N.D.Iowa 2004) (citations omitted).

We acknowledge the terms of the lease did not specifically require the tenant to comply with the Swampbuster law or specifically comply with any farm program rules or regulations. Notwithstanding, there is no dispute that Mike knew of the wetlands designation and understood that to till and plant those acres disqualified

---

6. There is no dispute that corn, unlike alfalfa, is an agricultural commodity as defined by the Swampbuster law. See 16 U.S.C. § 3801(a)(1); 7 C.F.R. § 12.2 ("Agricultural commodity means any crop planted and produced by annual tilling of the soil, including tilling by one-trip planters, or sugarcane.")

him from USDA benefits. The lease states that the tenant must "comply with all terms of the conservation plan and any other environmental plans for the leased premises." There was testimony from George Moriarty, a farm consultant, that "when you sign for the government program, that you are agreeing that you will comply with those. That's part of your acceptance of the government program." And farm real estate salesperson, Jon Hjelm, stated, "If the farm is enrolled in the farm program, then there's a conservation plan filed at the NRCS office. And it would be the tenant's duty to follow the NRCS program as filed at the NRCS office to make sure he's enrolled in the farm program." On the basis of this evidence, we are satisfied that there was a conservation plan for the land subject to the lease—to not till the wetlands—and Mike violated the conservation plan.

**2. Good husbandry?** Section five of the farm lease also states, "Tenant shall do what is reasonably necessary to control soil erosion including, but not limited to the maintenance of existing watercourses, waterways, ditches, drainage areas, terraces and tile drains, and abstain from any practice which will cause damage to the Real Estate." The notice to quit cited Mike's "failing to maintain waterways and drainage areas" and "failing to abstain from practices which damaged the real estate." The district court concluded that "Mike's farming practices demonstrate an above average standard that conforms to the principles of good husbandry." The court also concluded that there is no evidence that Mike damaged the real estate.

 We disagree that a farm tenant who generally uses good farming practices cannot be in breach of the good husbandry clause. *See Quade v. Heiderscheit,* 391 N.W.2d 261, 265–66 (Iowa Ct. App.1986) (concluding tenant followed ac-ceptable farming practices in part, but awarding damages for reduction in crop in violation of good farming practices). Furthermore, whether damages were sustained does not entirely resolve the issue of whether Mike's actions constitute a breach. Rather, the lack of damages more appropriately relates to what relief, if any, should be afforded.

The landlords claim that "[g]ood husbandry practices do not include placing your landlord at risk to lose eligibility for government farm program benefits and Federal Crop Insurance." In support of this argument they rely in part on the testimony of John Cowan, a federal crop insurance agent, who testified,

> A. My opinion is that, being the landlord, they should be asked whether to do anything. And if they were going to till up a wetland, to be done properly, everything would have to be done through FSA and signed by the tenant and the landlord to do it, with approval of the FSA.

> Q. Why, in your opinion, is it important for a tenant to seek the—first of all, to notify the landlord and seek consent of the landlord before they convert a wetland or till up a wetland? A. Well it could have a detrimental effect on the landlord. And it's common practice that a tenant would consult a landlord before they do anything to a farm. It's not their property.

George Moriarty also "absolutely" believed that a tenant should consult with their landlord before tearing up a wetland and planting an agricultural commodity.

 The term "good husbandry" is not susceptible to a specific definition because it is dependent upon the facts and evidence as well as upon current farming

practices.[7] One authority has given some clarity to this elastic term in discussing a tenant's obligations, and distinguishing between waste and poor husbandry:

> A tenant's obligation to preserve the leased premises includes the duty to refrain from committing waste or engaging in poor husbandry. Essentially waste means the permanent or substantial injury or exploitation of land or natural resources, such as by removal of topsoil, destruction of buildings or fences, cutting or sale of timber, destruction of shrubbery or other cover crops, and the like. Poor husbandry means poor farm practices such as failure to rotate crops, contour plow, or plant a cover crop. The term waste has a broader meaning and may include poor husbandry.

2 Neil E. Harl, *Agricultural Law* § 8.04(4)(a), at 8–43 (2005).

▉ Another authority has noted the stewardship duty of today's farmers in respect to care of the land, stating: "When the parties use a written form lease including specific clauses on proper husbandry and care of the soil, there is little doubt the reasonableness and impact of the tenant's farming practices are subject to judicial scrutiny." Neil D. Hamilton, *Feeding our Future: Six Philosophical Issues Shaping Agricultural Law*, 72 Neb. L. Rev. 210, 230 (1993). Moreover, our supreme court has observed that "[t]he state has a vital interest in protecting its soil as the greatest of its natural resources, and it has a right to do so." *Woodbury Cnty. Soil Conservation Dist. v. Ortner*, 279 N.W.2d 276, 278 (Iowa 1979).[8]

▉ The lease at issue contains a good husbandry clause and imposes various other stewardship duties upon the tenant that are intended to protect the land. Under the facts and evidence presented, we have no difficulty concluding that tearing up a wetland without the landlord's approval, particularly where the wetland had been certified under the Swampbuster law and had not been tilled for over twenty years, is contrary to the good husbandry clause. For these reasons, we conclude Mike's actions in tilling the wetlands without the landlords' approval or consent constitutes a violation of the tenant's duty to use good husbandry practices as imposed under the lease.

## C. Do the breaches of lease terms support termination?

▉ Section twelve of the lease provides that a tenant who violates the terms of the lease is subject to legal and equitable remedies to which the landlord is entitled. Here, the landlords have sought termination of the leasehold rather than damages. Our supreme court has long

---

7. *See McElwee v. DeVault*, 255 Iowa 30, 120 N.W.2d 451, 453–54 (1963) (noting poor husbandry reflected by landlord's proof of allegations that tenant failed to: cut "weeds and burs," pull "corn out of the beans," properly prepare for planting, properly cultivate, and properly spread manure); *Meeker v. Shull*, 235 Iowa 701, 17 N.W.2d 514, 517 (1945) (upholding "finding that the plowing was excessive" and "constituted waste and a failure to farm in good farm-like manner" where tenant plowed a 24–acre parcel that had been in permanent pasture for seven years without consent of landlord).

8. One court observed: "Conservation was and is at all times so fundamental that its necessity has been recognized by practically all thinking people who are familiar with the subject." *Kincaid v. United States*, 119 Ct.Cl. 257, 96 F.Supp. 468, 472 (1951). "This idea of conservation of the land as a farming practice is not new. It will be recalled that under the Mosaic law the Hebrew was commanded to allow his crop lands and vineyards to lie fallow, taking no harvest from them, every seventh year." *Georgia Power Co. v. Fletcher*, 113 Ga.App. 559, 148 S.E.2d 915, 918 (1966) (citing *Leviticus* 25:1–10).

determined that substantial compliance with the terms of the lease will avoid a forfeiture. *Beck,* 150 N.W.2d at 659. This action was brought in equity, and "it is the general rule that equity abhors a forfeiture." *Jamison v. Knosby,* 423 N.W.2d 2, 4 (Iowa 1988).

Mike testified he was not aware he had jeopardized the petitioners' benefits in tilling and planting the acres. Mike also restored the wetlands the next crop year. Pursuant to 16 U.S.C. § 3821,

> any person who in any crop year produces an agricultural commodity on converted wetland, as determined by the Secretary, shall be (1) in violation of this section; and (2) ineligible for loans or payments in an amount determined by the Secretary to be *proportionate to the severity of the violation.*

(Emphasis added.) Here, Mike and the landlords were initially denied all federal farm program benefits. At the time this action was initiated, the land had been damaged by the conversion of the wetlands by Mike's tilling and planting corn, and the wetlands had not yet been restored. In light of the severity of the benefits that were initially denied, and the loss of the wetlands, at least before their restoration, we conclude the breach was a material breach by Mike's failure to substantially comply with the terms of the lease. *See Beck,* 150 N.W.2d at 659.

Mike urges that if his actions constituted a breach of the lease, termination of the lease and forfeiture are not equitable because the wetlands were restored and no financial cost was ultimately incurred by the landlords. We agree.

Even where a material breach exists, ordinarily a party may cure the failure. Restatement (Second) Contracts §§ 237(b) ("Even if the failure is material, it may still be possible to cure it by subsequent performance without a material failure."), 242 cmt a. ("Ordinarily there is some period of time between suspension and discharge, and during this period a party may cure his failure."), *available at* Westlaw (database current through April 2012). Our supreme court has similarly determined that although the commission of waste on leased properties "will work a forfeiture," where the acts complained of could be removed easily without damage to the building and the landlord incurred no expense, forfeiture was not justified. *See Bentler v. Poulson,* 258 Iowa 1008, 141 N.W.2d 551, 553 (1966) (concluding that tenant's installation of a dishwasher and a new furnace, which both required holes be cut into the roof for ventilation, may be repaired easily). Here, the landlords have not incurred any significant damages and have only sought a forfeiture of the lease. Although we appreciate their desire to terminate this lease due to its length and minimal cash rent, the facts reflect that the tenant has cured his material breach of the farm lease and equity does not support enforcing a forfeiture.

Our decision here is also consistent with cases in other jurisdictions where landlords have sought termination of a lease for a violation of law where the tenant cured or corrected the violation in a reasonable amount of time, and the courts held that the termination was not warranted. *McNeece v. Wood,* 204 Cal. 280, 267 P. 877, 879 (1928) (noting tenant took prompt action in removing bookmakers from leased property); *Sherwood Med. Indus., Inc. v. Building Leasing Corp.,* 527 S.W.2d 407, 411 (Mo.Ct.App.1975) (finding lack of continuous or customary illegal use and prompt correction of violation); *Lewis v. Clothes Shack, Inc.,* 67 Misc.2d 621, 322 N.Y.S.2d 738, 739 (N.Y.Sup.Ct.1971) (noting removal of illegal storefront in three days). Here, the restoration of the wet-

lands has sufficiently cured the violation of the law and breaches to the extent that termination is not an equitable remedy under these facts.

In conclusion, upon our de novo review of the circumstances, and in light of the principle that "equity abhors a forfeiture," *Jamison,* 423 N.W.2d at 4, we find no error in the district court's dismissal of this FED petition.

**AFFIRMED.**